# Exhibit 4

**IN THE HIGH COURT OF JUSTICE**　　　　　　**Claim no. KB-2025-001365**
**KING'S BENCH DIVISION**
**MEDIA AND COMMUNICATIONS LIST**

**B E T W E E N :**

**OVIK MKRTCHYAN**

**Claimant**

**- and -**

**(1) 2TROM MEDIA GROUP LTD**
**(2) VICTOR TOKAREV**

**Defendants**

---

**PARTICULARS OF CLAIM**

---

**Parties**

1. The Claimant is a businessman and entrepreneur. He is the sole shareholder of Gor Investment Ltd (Company number 03820831) ("**GIL**"), the parent company of a diverse portfolio of companies based in the UK, Uzbekistan and Canada. He is also a shareholder of five other UK-based companies, including the UK-registered company Gor Logistic Limited (Company number 04547356) ("**GLL**"), of which the Claimant is the sole shareholder. He founded the Asia Alliance Bank.

2. The First Defendant is a UK-registered company (Company number 11673306) and the owner and operator of the London Post website (london-post.co.uk) ("the Website"), the Twitter/X account @LondonPostUK and the Facebook page https://www.facebook.com/LondonPostUK.

3. The Second Defendant is the sole director of the First Defendant.

1

**The words complained of**

4. On or about 19 October 2024, the Defendants and each of them published an article on the Website, entitled "*Corruption Networks of Uzbekistan: From Washington to Tashkent*". It remains accessible at the following URL: https://london-post.co.uk/corruption-networks-of-uzbekistan-from-washington-to-tashkent/ ("**the Article**").

5. The Article contained the following underlined words defamatory of the Claimant ("**the Words Complained Of**"):

"[Headline] ***Corruption Networks of Uzbekistan: From Washington to Tashkent***

[1] *When you think about U.S. influence in Central Asia, especially in places like Uzbekistan, the image often conjured up is one of aid, partnership, and "democratic reforms." But behind the polished handshakes, diplomatic meetings, and promises of economic support, there's a darker reality at play. This reality is that American elites—and their counterparts in former Soviet republics—are manipulating every tool at their disposal to control, exploit, and profit from a region they treat like a global chessboard.*

[2] *At the centre of this intrigue is a cast of shady characters, including Ovik Mkrtchyan, a businessman with deep ties to Uzbekistan's former dictator, Islam Karimov. Mkrtchyan, alongside key player like Uktam Aripov, has created a network of financial and political schemes that not only undermines Uzbekistan's sovereignty but keeps the country firmly within the grip of foreign manipulation.*

[Subtitle] *Lobbyists, Politicians, and the Dark Side of U.S. Diplomacy*

[3] *What makes this even more shocking is the involvement of American lobbyists and politicians. Mkrtchyan and his partners have built connections with the U.S. political elite through firms like "Linden Strategies," managed by*

*former White House insiders like Steve Payne. These aren't just casual meetings; this is a calculated web of influence designed to siphon money out of Uzbekistan while simultaneously propping up Western politicians.*

[4] *Even more troubling, figures like former U.S. Secretary of State Michael Pompeo are said to be tied to this scheme through Gorinvestment* [sic]. *The partnership between Uzbek and American elites raises serious questions about who really benefits from these so-called "development deals." Is it the Uzbek people, who still struggle with poverty and lack of basic freedoms, or the small group of elites with offshore accounts?*

[Subtitle] *Uzbekistan's New Reality: The Illusion of Progress*

[5] *While President Shavkat Mirziyoyev speaks of modernization and reform, the reality is that* underlined: corruption remains deeply embedded in the system.

[6] *Asia Alliance Bank in Uzbekistan, despite its outwardly clean reputation, has found itself at the center of dubious events in recent years, particularly related to its privatization and suspicious internal reshuffling. In 2022, the government sold a controlling stake in the bank to British company Gor Investment Limited — a firm linked to Ovik Mkrtchyan, notorious for his involvement in international corruption schemes. This move, portrayed as part of a broader privatization program for state assets, has sparked serious concerns over the transparency of the deal. Many suspect that key assets and control were transferred to affiliated individuals before the sale, further entrenching Mkrtchyan's influence within Uzbekistan's financial sector.*

[7] *While Asia Alliance Bank hasn't been directly implicated in major corruption scandals,* Mkrtchyan's connection through Gor Investment raises undeniable questions. As Uzbekistan's banking sector remains mired in corruption, this bank has become part of broader schemes to siphon off capital. Embezzlement and fraud in state banks have become routine, with significant funds intended for social programs disappearing into shadowy networks, leaving little trace.

[8] *All of this only deepens the public's distrust in Uzbekistan's banking system.* <u>*Government-led reforms, touted as efforts to combat corruption, serve more as a cover for those leveraging the bank to launder questionable funds and solidify their positions within the country's elite — figures like Mkrtchyan among them.*</u>

[9] *While the rhetoric from Tashkent and Washington is all about progress, democracy, and development, the reality is far more cynical. The same dirty money, the same shadowy political deals, and the same players remain firmly in control.*

[Subtitle] *What Does the Future Hold?*

[10] *This isn't just a story about Uzbekistan. It's a tale of how Western elites continue to exploit developing countries for their own gain. Corruption has become a tool of influence, used to manipulate governments and line the pockets of a few.* <u>*Until figures like Ovik Mkrtchyan and Uktam Aripov are held accountable—and until their Western backers face the same scrutiny— countries like Uzbekistan will remain pawns in a much larger game*</u>.

[11] <u>*As the West continues to preach democracy and development, its actions behind closed doors tell a different story: one of corruption, exploitation, and a new form of colonialism dressed up as economic aid. The question is, how long will this charade continue before the full extent of this corruption is exposed? And when will both local elites and their Western enablers finally be brought to justice?*</u>"

**Defamatory meaning**

6.  The Words Complained Of, in their natural and ordinary meaning and when read in the full context of the Article meant and were understood to mean that:

    (1) The Claimant is the key player in an Uzbekistan corruption network, which embezzles state funds using offshore accounts and launders money to gain political favours; and

> (2) The Claimant used the purchase of a controlling stake in Asia Alliance Bank in 2022 by his company, Gor Investment Ltd, as a front for him to embezzle state funds and corruptly seize control of state assets in Uzbekistan.

## Serious harm under s.1(1) of the Defamation Act 2013

7. Publication of the Article has caused, or is likely to cause, serious harm to the Claimant's reputation.

_____

### PARTICULARS OF SERIOUS HARM

_____

7.1.  The imputations pleaded at paragraph 6 above are salacious, grave and inherently likely to cause harm to both the Claimant's personal and professional reputations. The Defendants accuse the Claimant of organised, serious and sustained criminality and corruption, involving the embezzlement of state funds and corrupt seizure of control of assets for his own financial gain.

7.2.  The true extent of publication is not yet known. However, pending disclosure, the inference will be invited that the Article has been published to a substantial but unquantifiable number of people in this jurisdiction and around the globe, as:

7.2.1.  The London Post has a substantial online following. Its Twitter/X account (@LondonPostUK) has 3,071 followers and its Facebook page (www.facebook.com/LondonPostUK) has 18,000 followers.

7.2.2.  In the premises, it is to be inferred that the Defendants' Website attracts a similarly high number of regular readers.

7.3.  The Claimant does not court media attention and, prior to the Defendants' publication of the Article, there were: very few articles about him published

5

in England and Wales, or in English online; and no articles critical of the Claimant on any website or social media platform as prominent as those operated by the Defendant. As such, the Court will be asked to infer that readers in this jurisdiction would only learn of the imputations concerning the Claimant identified at paragraph 6 above from the Defendants' defamatory Article.

7.4.    Following publication of the Article, GLL and GIL have been refused services from UK financial institutions in the following circumstances:

7.4.1. On 27 November 2024, Revolut Bank ("**Revolut**") began a compliance process in respect of GLL. The Claimant's representative responded on 6 December 2024. On 31 December 2024, Revolut requested information about the Claimant's involvement with GLL within 21 days as part of a compliance investigation, which was required to maintain access to the account. Thereafter:

(a) GLL's bank account was suspended before the expiry of that period, on 6 January 2025;

(b) GLL's representative provided a comprehensive account of the requested information on 13 January 2025;

(c) In the second half of February 2025, Revolut informed two companies which were affiliated with GLL, and which held accounts with it, that they would be subject to an account closing procedure; and

(d) GLL's representative was notified on 14 March 2025 that Revolut would no longer be offering it banking services and would be closing both GLL's account, and the personal account of a family member.

7.4.2. On 21 January 2025, UK financial provider Emerald24 refused to open an account for GIL, without giving any reasons.

7.5. The Court will be asked to infer that, in the circumstances, GLL, GIL and the Claimant's family member were refused banking services because of harm caused to the Claimant's reputation arising from the Article. The Claimant will rely on the following facts and matters in support of the inference:

7.5.1.    the absence of prior media attention or interest in him, as to which paragraph 7.3 above is repeated;

7.5.2.    the exacerbation of any pre-existing scrutiny of, or interest in, the Claimant by the publication of the Article;

7.5.3.    the Defendants' publication of the Article on such a wide scale made it likely that it would have been available to businesses offering banking and financial services, where they conducted regulatory and compliance checks;

7.5.4.    the Claimant's very close association with both GIL and the similarly named GLL, as sole shareholder of both companies, and the direct references in the Article to both GIL and the Claimant; and

7.5.5.    the coincidence in time between the Defendants' publications of the Article and the refusal of banking services.

7.6.    The allegations are presented as factual and truthful. The Defendants did not request or include any comment on the part of the Claimant or any other information which might cast doubt on the claims.

7.7.    The Claimant will also rely on the grapevine effect.

**<u>Relief</u>**

**(a) Damages**

8. In support of the Claimant's claim for general and/or aggravated damages, he will rely upon the following facts and matters:

8.1. Paragraphs 7.1 - 7.7 above are repeated.

8.2. The Defendants' publication of the Article has caused the Claimant very significant distress. The Claimant feels that his life and the lives of his family members have been endangered by the publication of the Article, which, given the extremely serious nature of the imputations it contains, is likely to prompt adverse responses to them from state and state security service actors.

8.3. The Defendants published the Article as part of an apparently coordinated disinformation campaign carried out against the Claimant and his family members and business associates, escalating from August 2024 onwards ("**the Campaign**"). The Campaign has caused the Claimant very significant damage (including financial damage) and the fact that the Article plays a part in it has greatly exacerbated his resulting distress. The Claimant will rely on the following facts and matters:

8.3.1. The Campaign initially took place from around August 2024, in the form of anonymously authored publications on Russian language websites and social media platforms, before increasing in scale and intensity during the second half of 2024.

8.3.2. The Article was the first iteration of the Campaign to be prominently published in English.

8.3.3. When first published, the Article was the most high-profile, and ostensibly credible, iteration of the Campaign, and includes allegations against the Claimant which have consistently been made as part of the Campaign, such as falsely associating him with Islam Karimov and/or the Karimov family.

8.3.4.    The Website predominantly carries local news articles about events in London, the majority of which appear to be republications of council, local government, and corporate press releases. It does not appear to publish foreign news, or investigations in relation to topics similar to those purportedly addressed by the Article.

8.3.5.    The Article:

(a) is distinct from the typical content of the Website, as described at paragraph 8.3.4 immediately above, indicating that it was written and published on a different basis from the majority of the other content of the Website;

(b) does not carry the byline of an identified journalist, instead being attributed only to *"Ldn-Post"*, indicating that no individual writer or editor wished to be understood to be responsible for or associated with its content;

(c) is written in a hyperbolic, gratuitously sensationalist, and grandiose style, inappropriate to the nature of the allegations it contains;

(d) makes vague but extremely serious allegations of wrongdoing against the Claimant and his businesses, with a lack of precision or detail, which suggests it was written and published with no concern for the veracity of its content, or any associated legal risk; and

(e) is incoherent, and gratuitously refers to Asia Alliance Bank, a private bank in the highly-regulated Uzbek banking sector, in which the Claimant was, as at the date of publication of the Article, only a shareholder, as to which the Article contains self-contradictory statements to the effect that the bank is somehow not only *"[6] … at the center of dubious events in recent years"*, but also that it *"[7] … hasn't been directly implicated in major corruption scandals"*. This indicates a

9

lack of editorial oversight or proper consideration of the allegations being advanced as part of the Article.

8.3.6.    In the circumstances, the Article was published as part of the Campaign, and not as an exercise in legitimate and responsible journalism.

8.4.    The Defendants did not approach the Claimant for comment prior to the Article's publication. Had they done so, the Claimant could have corrected the position.

8.5.    The Claimant sent emails to several of the Defendants' employees on 4 December 2024, but these were all returned as the email addresses could not be found and appear to be fictitious. The Claimant has therefore been left with no option but to issue a claim without engaging in any Pre-Action Protocol correspondence.

9.    In support of the Claimant's claim for exemplary damages under section 34 of the Crime and Courts Act 2013 ("**the CCA 2013**"), he will rely upon the following facts and matters:

9.1. Paragraphs 7 and 8 above are repeated.

9.2. The First Defendant is and was at all material times a "relevant publisher" within the meaning of section 41(1) of the CCA 2013.

9.3. The present claim is a claim for libel and is therefore a "relevant claim" as defined by section 42(4)(a) of the CCA 2013.

9.4. The claim is related to the publication of news-related material within the meaning of section 41(2) of the CCA 2013.

9.5. The First Defendant, by the 'Contact Us' page on its Website (https://london-post.co.uk/contact/), purports to be regulated by the Independent Press

Standards Organisation ("**IPSO**") and to abide by IPSO's Editors' Code of Practice. However, this is a sham: it does not appear in the approved list of IPSO members as set out at https://www.ipso.co.uk/making-a-complaint/who-ipso-regulates/. In any event, IPSO is not an " approved regulator" as defined by section 42(2) of CCA 2013.

9.6. The First Defendant is not a member of IMPRESS, the relevant "approved regulator".

9.7. In the circumstances set out above, the First Defendant has demonstrated a deliberate or reckless disregard of an outrageous nature for the Claimant's rights, and it is appropriate to punish it by awarding exemplary damages. Other remedies would not be adequate.

**(b) Injunction**

10. In support of the Claimant's claim for an injunction, he relies upon the facts and matters pleaded above at paragraphs 8.3 to 8.5 above. The Claimant has been left with no alternative but to issue proceedings to secure the Article's removal.

**(c) Order under s.12 Defamation Act 2013**

11. The Claimant seeks an order under s.12 of the Defamation Act 2013 for the Defendants to prominently publish a summary of the judgment on its website and social media pages.

**AND the Claimant claims**

(1) Damages, including aggravated damages and exemplary damages under section 34 of the Crime and Courts Act 2013;

(2) An injunction to restrain the Defendants, whether by themselves, their servants, agents, or otherwise howsoever from publishing and/or causing to be published the same or similar words defamatory of the Claimant;

(3) An Order that the Defendants publish a summary of the court's judgment under s.12 Defamation Act 2013;

(4) Costs; and

(5) Such further or other relief as the Court deems appropriate.

**GERVASE DE WILDE**

**LILY WALKER-PARR**

**5RB**

**12 June 2025**

**STATEMENT OF TRUTH**

I believe that the facts stated in these Particulars of Claim are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Name: Ovik Mkrtchyan

Date: 12 June 2025

Signature: